**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN**

---

CARRIE MEYER,

                    **Plaintiff,**

    v.                                                       **Case No. 07-C-649**

METROPOLITAN LIFE
INSURANCE COMPANY,

                    **Defendant.**

---

## DECISION AND ORDER

---

Carrie Meyer ("Meyer") brought this action against Metropolitan Life Insurance Company ("MetLife") alleging that MetLife violated the Employee Retirement Income Security Act of 1974 ("ERISA") by denying her disability benefits. MetLife filed a motion for summary judgment, which the Court will grant for the following reasons.

### BACKGROUND

Meyer worked as a teacher for Wisconsin Evangelical Lutheran Synod, where she was a participant in a long-term disability plan (the "Plan"). The Plan defines "disability" as being "unable to earn more than 80%" of Meyer's pre-disability earning in her "own occupation." (R. 245.) "Occupation" is defined as "the essential functions" that Meyer would "regularly perform that provide [her] primary source of earned income." (R. 246.)

The plan administrator and plan fiduciaries had discretionary authority to interpret the terms of the Plan and determine eligibility. (R. 279.)

On August 2, 2005, Meyer submitted a claim for long-term disability benefits to MetLife. Meyer claimed that her disability began on May 16, 2005, as a result of her "anxiety, insomnia, [and] depression." (R. 2.) Dr. Gary Schnell, who was one of Meyer's treating physicians, included an initial physician statement that accompanied Meyer's claim. In his statement, Dr. Schnell indicated that he diagnosed Meyer with "primary insomnia." (R. 9-11.) MetLife sent Dr. Schnell a letter seeking additional evidence of Meyer's condition, which Dr. Schnell provided on January 25, 2006. (R. 21.) Dr. Schnell accompanied the medical records with a statement opining that Meyer could not work as a full-time teacher. (*Id*.)

After reviewing the medical records and interviewing Meyer personally, MetLife denied her claim for long-term disability benefits. MetLife explained that in June 2005, Meyer had resigned and applied for a job working with children in the tutoring setting. In September 2005, she started a new job as the church's secretary and was simultaneously taking a graduate course. In November 2005, Meyer reported that she was "doing pretty good and sleeping fairly well." Yet, in January 2006, her sleep problems increased due to anxiety and stress. (R. 37-38.)

Based on the foregoing, and after reviewing the entire medical record, MetLife concluded that there was "no medical evidence to support a global severity of impairment

2

from a Psychiatric Disorder that would prevent [her] from perform[ing] [her] occupational duties." Furthermore, MetLife noted that there was "no mental status exam, psychiatric, psychological, or neurological/psychological testing indicating functional or cognitive impairments." The office notes also, according to MetLife, did "not provide any global assessment of functioning score, nor do the notes provide any specific details of why [she was] unable to perform [her] occupation." (*Id*.)

In its denial letter, MetLife advised Meyer of her appeal right and invited her to submit any additional documents or evidence that would support her claim. Meyer obtained counsel, who then asked for an extension of time to file an appeal. MetLife granted Meyer's request for an extension. Meyer then filed an appeal with additional documentation. Included in the supplementation of the record was Dr. Schell's report, which stated that Meyer's Global Assessment of Function ("GAF") was a 51 on a scale of 0 through 100. He also indicated that Meyer struggles with being out with others, focusing and concentrating, and as a result, is unable to work. (R. 43-44.) After submitting her appeal, Meyer's counsel wrote MetLife and asked for a delay in its review of the appeal because Meyer had an appointment with a rheumatologist on December 7, 2006. (R. 158.)

MetLife then gave Meyer's claim file, including her medical records, to Dr. Robert Slack, M.D., for review. (R. 167-169.) Dr. Slack was a Diplomate of the American Board of Psychiatry and Neurology and an Associate Professor of Clinical Psychiatry at the University of Illinois, College of Medicine at Rockford. (*Id*.) Dr. Slack reviewed over 80

3

pages of progress notes from Dr. Schnell and lay affidavits submitted by Meyer's counsel. (*Id*.) After conducting his review, Dr. Slack concluded that there was no evidence that demonstrated that Meyer was unable to work. (R. 168.) In support of his conclusion, he noted that Meyer did not submit to MetLife any sleep studies that she reported she had undergone, and that she did not submit any reports from Ms. Aado, who was her social worker and therapist. (*Id*.) Meyer also did not submit reports from two other mental health providers mentioned in the record. (*Id*.) As for Dr. Schnell's opinion that she could not work, Dr. Slack pointed out that his conclusion was based solely on Meyer's claim that she could not do so. (*Id*.) Throughout the treatment record, Dr. Slack indicates that Dr. Schnell, nor anyone else, conducted an independent assessment of her mental status presentation as compared to her work requirements. (*Id*.) Dr. Slack also noted that other than absence from work, "no actual deterioration of any work function was noted or reported at all" from her fellow employees and supervisors. (*Id*.) Rather, "her work was exemplary and praised." (*Id*.)

After receiving Dr. Slack's review, MetLife asked that Meyer's counsel provide to MetLife the records from Meyer's December 7, 2006 appointment with her rheumatologist. (R. 174.) Instead of sending these records, Meyer's counsel sent MetLife records from a visit with the dentist who evaluated Meyer's transmandibular joint (TMJ) problems. (R. 178-191.) MetLife sent these records to Dr. Slack, who concluded that the "additional information has no impact on my prior psychiatric determination about Ms. Meyer's ability

4

to perform the essential requirements of her own job or any and all jobs." (R. 198-200.) On February 9, 2007, MetLife denied Meyer's appeal, relying in substantial part on Dr. Slack's assessment. (R. 201-204.)

**DISCUSSION**

Summary judgment is appropriate if the evidence shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The parties agree that the Court must review Hartford's denial of Winter's claim under the arbitrary and capricious standard. The arbitrary and capricious standard "is the least demanding form of judicial review of administrative action, and any questions of judgment are left to the administrator of the plan." *Trombetta v. Cragin Fed. Bank of Savings Employee Stock Ownership Plan*, 102 F.3d 1435, 1438 (7th Cir. 1996). The Court may only overturn the administrator's decision if it is "downright unreasonable." *Carr v. Gates Health Care Plan*, 195 F.3d 292, 294 (7th Cir. 1999) (quoting *Butler v. Encyclopedia Britannica, Inc.,* 41 F.3d 285, 288 (7th Cir. 1994)). Furthermore, the Court's review is limited to the administrative record. *Perlman v. Swiss Bank Corp. Comprehensive Disability Protection*, 195 F.3d 975, 981-82 (7th Cir. 1999).

In the instant action, MetLife had a rational basis for denying Meyer's claim. While Dr. Schnell reported that she was unable to work, he based that solely on her claims that she was unable to do so, rather than basing his conclusion on an independent assessment of her mental status presentation as compared to her work requirements. In addition, Dr. Slack

5

noted that other than absence from work, her fellow employees and supervisors did not report any "actual deterioration of any work function." Rather, her co-workers and supervisors all reported that "her work was exemplary and praised." Also, in September 2005, after Meyer submitted her claim for disability, she worked as a secretary while also simultaneously taking a graduate course. Indeed, in November 2005, Dr. Schnell noted that Meyer was doing "pretty good" and sleeping "fairly well." Accordingly, MetLife's denial of her disability claim was not "downright unreasonable." *Carr*, 195 F.3d at 294.

However, Meyer raises several objections. First, she argues that MetLife erroneously required Meyer to establish a "history of psychiatric hospitalization, psychosis, delirium/dementia, or suicidal/homicidal behavior," which is a standard that does not appear in the Plan. Meyer's argument is unavailing. MetLife never required such a showing to receive disability benefits. Rather, MetLife required exactly what the Plan provided – that she show an inability to perform the essential requirements of her occupation. The quoted portion to which Meyer objects reads in full as follows:

> In summary, the consultant noted that the records show very little progress or change in complaints other than a waxing and waning. There is no change in acuity noted other than Ms. Meyer stating that she felt she could no longer work in the spring of 2005. There is no history of psychiatric hospitalization, psychosis, delirium/dementia or suicidal/homicidal behavior. The consultant concluded that there is no evidence in the record that Ms. Meyer lost the option or choice of *performing the essential requirements of her own occupation* from May 15, 2005, through August 14, 2005 and then continuing.
>
> (R. 203) (emphasis added.)

Meyer's first objection, therefore, is without merit.

6

Next, Meyer claims that MetLife's decision contravened the requirement of 29 C.F.R. § 2560.503-1(f)(3) by not notifying her that MetLife needed additional information. Section 2560.503-1(f)(3) requires that if a claimant does not provide sufficient information, the plan administrator must give the claimant an additional 45 days to provide it. Here, MetLife afforded Meyer an opportunity to submit records from her December 7, 2006 appointment with her rheumatologist, but Meyer instead submitted records from her dental appointment pertaining to her TMJ. Furthermore, while Dr. Slack noted that Meyer did not provide her sleep study results and records from her appointments with her social worker, the absence of those records was not a reason that MetLife articulated for denying her claim. MetLife was not obligated, therefore, to allow Meyer additional time to submit them.

Meyer also argues, relying on *Hawkins v. First Union Corporation Long-Term Disability Plan*, 326 F.3d 914 (7th Cir 2003), that MetLife impermissibly failed to afford Meyer's treating physician greater weight than Dr. Slack's. As the Seventh Circuit subsequently noted, though, *Hawkins* was decided before the Supreme Court's decision in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003), in which the Supreme Court rejected the notion that plan administrators are obliged to accord special deference to the opinions of treating physicians. *See Sperandeo v. Lorillard Tobacco Co.*, 460 F.3d 866, 875 n.7 (7th Cir. 2006). She also avers that Dr. Slack had an obligation to contact Meyer's treating physician before rendering an opinion, but no case or regulation imposes such a requirement on Dr. Slack.

7

Finally, Meyer contends that MetLife improperly required objective evidence of her fatigue, instead of relying on her description of her fatigue. Yet, MetLife never required objective proof of her fatigue. Rather, MetLife sought objective evidence showing her inability to work. Requiring such evidence in support of a disability claim is not arbitrary and capricious. *See Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322-23 (7th Cir. 2007) ("A distinction exists . . . between the amount of fatigue or pain an individual experiences, which . . . is entirely subjective, and how much an individual's degree of pain or fatigue limits his functional capabilities, which *can be objectively measured*.") (emphasis added.)

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

MetLife's Motion for Summary Judgment (Docket No. 19) is **GRANTED**.

The clerk is directed to enter judgment and close this case accordingly.

Dated at Milwaukee, Wisconsin this 14th day of July, 2008.

**BY THE COURT**

*s/ Rudolph T. Randa*
**Hon. Rudolph T. Randa**
**Chief Judge**